Peter R. Afrasiabi (SBN 193336)
Email: pafrasiabi@onellp.com
Taylor C. Foss (SBN 253486)
Email: tfoss@onellp.com
**ONE LLP**
23 Corporate Plaza, Suite 150-105
Newport Beach, CA 92660
Telephone: (949) 502-2870
Facsimile: (949) 258-5081

Attorney for Plaintiff,
MICHAEL GRECCO PRODUCTIONS, INC.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

MICHAEL GRECCO PRODUCTIONS, INC., a California corporation,

Plaintiff,

v.

TWITTER, INC., a Delaware corporation; X CORP., a Nevada corporation; and DOES 1-10, inclusive,

Defendants.

Case No. 2:24-cv-04878-MEMF-JC
Hon. Maame Ewusi-Mensah Frimpong

**PLAINTIFF'S OPPOSITION TO DEFENDANT X CORP.'S MOTION FOR EVIDENTIARY SANCTIONS**

**[DECLARATIONS OF TAYLOR FOSS AND MICHAEL GRECCO SUBMITTED CONCURRENTLY HEREWITH]**

Date: January 15, 2026
Time: 10:00 a.m.
Crtrm: 8B

# TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. FACTUAL BACKGROUND .......... 4

III. LEGAL STANDARD .......... 6

IV. ARGUMENT .......... 6

A. X Failed to Institute a Litigation Hold Related to Evidence and Information in X's Possession, Custody, and Control .......... 8

B. MGP Did Not Intentionally Spoliate Evidence .......... 10

C. X Failed to Provide Notice of Its License Defense—Either in Its Answer or Otherwise—and there Is No Factual Predicate for License .......... 13

D. The Timing of Michael Grecco's Deactivation of the @michaelgrecco Account Undermines X's Assertion of Bad Faith .......... 15

E. Twitter/X's Knowledge of Account Ownership .......... 16

F. X's Newly-Minted License Defense Undermines Its DMCA Safe Harbor Argument .......... 17

G. X Has Failed to Establish Prejudice Here .......... 19

V. CONCLUSION .......... 20

# TABLE OF AUTHORITIES

## Cases

*Akiona v. United States*,
938 F.2d 158 (9th Cir. 1991) .... 14

*AmeriPride Svcs, Inc. v. Valley Indus. Svc., Inc.*,
No. CIV S-00-113, 2006 U.S. Dist. LEXIS 59398, 2006 WL 2308442 (E.D. Cal. Aug. 9, 2006) .... 9

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
881 F. Supp. 2d 1132 (N.D. Cal. 2012) .... 9

*Cyntegra, Inc. v. Idexx Labs., Inc.*,
No. CV 06-4170 PSG, 2007 U.S. Dist. LEXIS 97417 (C.D. Cal. Sep. 21, 2007) .... 9

*Davis v. Blige*,
505 F.3d 90 (2d Cir. 2007) .... 8

*Facebook, Inc. v. Onlinenic Inc.*,
No. 19-cv-07071-SI (SVK), 2022 U.S. Dist. LEXIS 113060 (N.D. Cal. Mar. 28, 2022) .... 12

*Fast v. GoDaddy.com LLC*,
340 F.R.D. 326 (D. Ariz. 2022) .... 12

*Graham v. Honeywell Int'l Inc.*,
No. 3:23-cv-04865-RFL (KAW), 2025 U.S. Dist. LEXIS 201665 (N.D. Cal. Oct. 10, 2025) .... 6

*Hamilton v. Signature Flight Support Corp.*,
No. C 05-0490, 2005 U.S. Dist. LEXIS 40088 (N.D. Cal. Dec. 20, 2005) .... 9

*Hice v. Lemon*,
No. 19-cv-4666, 2021 U.S. Dist. LEXIS 244521 (E.D.N.Y. Nov. 17, 2021) .... 13

*Holloway v. Cty. of Orange*,
No. SACV 19-01514, 2021 U.S. Dist. LEXIS 31681 (C.D. Cal. Jan. 20, 2021) .... 13

*Mavrix Photographs, LLC v. LiveJournal, Inc.*,
873 F.3d 1045 (9th Cir. 2017) .......... 18

*Nation-Wide Check Corp. v. Forest Hills Distribs., Inc.*,
692 F.2d 214 (1st Cir. 1982) .......... 14

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.*,
971 F.3d 1042 (9th Cir. 2020) .......... 2

*Oracle USA, Inc. v. Rimini St., Inc.*,
879 F.3d 948 (9th Cir. 2018) .......... 2

*Porter v. City & Cty. of S.F.*,
No. 16-cv-03771-CW (DMR), 2018 U.S. Dist. LEXIS 151349
(N.D. Cal. Sep. 5, 2018) .......... 6

*Reinsdorf v. Skechers U.S.A., Inc.*,
296 F.R.D. 604 (C.D. Cal. 2013) .......... 14

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
306 F.3d 99 (2d Cir. 2002) .......... 9

*UMG Recordings, Inc. v. Hummer Winblad Venture Partners (In re Napster, Inc. Copyright Litig.)*,
462 F. Supp. 2d 1060 (N.D. Cal. 2006) .......... 9

*Viacom Int'l, Inc. v. YouTube, Inc.*,
676 F.3d 19 (2d Cir. 2012) .......... 8, 17, 18

*Vick v. Texas Employment Comm'n*,
514 F.2d 734 (5th Cir. 1975) .......... 14

**Statutes**

35 U.S.C. § 512(c)(1)(A) .......... 17, 18

**Rules**

Fed. R. Civ. P. 37(e) .......... 6

**Other Authorities**

Fed. R. Civ. P. 37 advisory committee's note (2015) .................................................. 6

https://www.theguardian.com/us-news/2024/dec/13/elon-musk-conflict-of-interest .................................................................................... 3

https://x.com/elonmusk/status/1524846562974875655 ............................................. 1

https://x.com/elonmusk/status/1910840422789763511 ............................................. 1

https://x.com/jack/status/1910829254214115681 ...................................................... 1

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff Michael Grecco Productions, Inc. ("MGP" or "Plaintiff") hereby opposes Defendant X Corp.'s ("X" or "Defendant") Motion for Evidentiary Sanctions. For the reasons set forth below, Defendant's motion should be denied in its entirety.

## I. INTRODUCTION

Defendant's introductory screed attempts to vilify Michael Grecco Productions, Inc. for enforcing copyright law as to Michael Grecco's photographs, but fails to acknowledge that X as a corporation is facilitating and participating in continued and willful copyright infringement. Indeed, while this litigation has been pending, Plaintiff has identified **nineteen** additional instances of infringement where X has received a DMCA takedown demand and failed to remove the infringing image.[1] X and Elon Musk may dislike that Plaintiff is enforcing the law or find the DMCA an impediment to their monetization of users' uploads, but X nonetheless must follow the law, regardless of its owner's open disdain for intellectual property law[2] and for the DMCA specifically.[3]

Defendant's motion for evidentiary sanctions is premised on a mischaracterization of the facts and a misapplication of the law regarding spoliation, preservation duties, and copyright defenses. First, while X now cries "license," X never pleaded the affirmative defense of license, such that neither Plaintiff MGP nor

---

[1] (*See* Grecco Decl. ¶ 14.) Plaintiff has asked X's counsel whether it would prefer MGP to amend its complaint further or whether MGP should file a new complaint alleging these further instances of copyright infringement and seek consolidation. Counsel for X have not responded. (Foss Decl. ¶ 8.) But notice has been given and Plaintiff believes these infringements occurring post-suit have been noticed and are part of this case.

[2] In an interaction on X, Jack Dorsey, the founder of Twitter, tweeted on X on April 11, 2025, "delete all IP law" (https://x.com/jack/status/1910829254214115681, accessed 4/22/2025) and in response, Musk tweeted his agreement (https://x.com/elonmusk/status/1910840422789763511, accessed 4/22/2025 .

[3] On May 12, 2022 at 1:18 PM, Elon Musk tweeted through his @elonmusk account: "Overzealous DMCA is a plague on humanity." (https://x.com/elonmusk/status/1524846562974875655.

Michael Grecco as an individual (and non-party to this litigation)[4] were not on notice of any assertion that the posting activity of Michael Grecco on his X account would be at issue as to any claim or defense in this case. And license to a copyright claim, express or implied, is an affirmative defense. *See Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 971 F.3d 1042, 1047 (9th Cir. 2020); *Oracle USA, Inc. v. Rimini St., Inc.*, 879 F.3d 948, 954 (9th Cir. 2018); *see also* Ninth Circuit Jury Instruction 17.25A ("Copyright-Affirmative Defenses-Express License").

Indeed, on the merits it is factually absurd as a newly minted defense claim—the user uploads were not uses/retweets of Grecco's uploads and X as a factual matter never issued a so-called license to the users anyway—which of course is why it was never pled, and which highlights this is simply a ploy to generate leverage against Plaintiff.

Further, X had a duty to preserve evidence and information in its possession, custody, or control that it believed relevant to the claims or defenses of this litigation, yet X failed to preserve the evidence stored on its servers that it now it claims it believes is relevant. The evidence in question, namely the account information and posting history for the @michaelgrecco X handle was at all times in the possession of X and neither MGP nor Michael Grecco (as an individual) ever had access or control to the evidence in question, nor the ability to delete it. Michael Grecco requested the deactivation of the @michaelgrecco account in December 2024, six months after the initiation of this lawsuit and almost a year since he sent most of the takedowns to X and/or Twitter, such that X is responsible for any deletion of data.

As with many aspects of this case, the dispute here centers around Elon Musk (*see supra* n.3). When Michael Grecco sent an email to the social media team for

---

[4] MGP does not control the @michaelgrecco handle, but instead is the entity tasked with licensing and enforcing the copyrighted images of Michael Grecco. The @michaelgrecco handle is controlled personally by Michael Grecco as an individual.

MGP directing them to cut all ties to X,[5] the decision to do so centered on the actions of Elon Musk, who had just recently had taken a high visibly role in the administration of Donald Trump in the Department of Government Efficiency ("DOGE") where Musk had taken a similar "slash and burn" approach to the federal government that he had taken at X, where his reduction of staffing and safeguards resulted in the disregard for copyright law and the flouting of DMCA takedown procedures. Notably none of the governmental subsidies or funding for Elon Musk's many enterprises (*e.g.*, SpaceX, Tesla, etc.) were cut as part of the DOGE cuts or by the Trump administration. As a result, despite gutting governmental programs, Elon Musk became richer as a result of embracing Donald Trump.[6] In light of Elon Musk's political actions, Michael Grecco made the decision to avoid any affiliation with Elon Musk through use of the X platform. As a result, Michael Grecco moved the social media efforts for his photography to Blue Sky. In an email to his social media team on December 1, 2024, Mr. Grecco stated bluntly in an email to his media team:

> I wanna close my Twitter account permanently. Any and all of them. I'd like to move everything over to blue sky. I think we have several Twitter accounts and I can tell you tomorrow what they are. I can't in good conscience support this asshole no matter what it means for my business.

(Grecco Decl. Exh. A.)

Mr. Grecco made his decision grounded in principle to detach from Elon Musk, even if it damaged Mr. Grecco's business. That is all. The facts simply do not support a finding that Plaintiff acted in bad faith to destroy material evidence. The decision to boycott the X platform was based on Michael Grecco's political disagreement with Elon Musk's behaviors, nothing more. Regardless, the

[5] (Grecco Decl., Exh. A.)

[6] *See, e.g.*, https://www.theguardian.com/us-news/2024/dec/13/elon-musk-conflict-of-interest.

deactivation of the @michaelgrecco account should never have resulted in the deletion of data because X should already have enacted data retention steps to preserve any data it believed relevant. This litigation had been pending for six months when Michael Grecco deactivated his account, which is ample time for X to identify the X accounts it believed were relevant to this litigation. Further, why would Michael Grecco wait until six months after the filing of the lawsuit to deactivate his account if his intention was to hide crippling evidence? The timing of Mr. Grecco's deactivation—and his email decrying his distaste for what Elon Musk had done—only fits into a fact scenario where the motive was protected political ideology and thus entirely unrelated to deleting evidence. Indeed, X is at fault here for failing to take appropriate steps to preserve evidence. X is the party that deleted the information for the @michaelgrecco account. This motion appears to be an opportunistic attempt to obtain through evidentiary sanctions what is simply not established in the record.

## II. FACTUAL BACKGROUND

Starting in late 2023 and continuing until the filing of the Complaint in June 2024, in response to an uptick in the amount of copyright infringement on the X Platform following the change in ownership to Elon Musk, Plaintiff MGP made a series of DMCA takedown demands on behalf of Michael Grecco, with Michael Grecco copied on those DMCA takedown demands.

MGP filed this action against X on June 10, 2024, alleging copyright infringement based on unauthorized user posts of MGP's photographs. On August 9, 2024, X filed an Answer to MGP's complaint. (ECF No. 20.) In that Answer, X did not assert the affirmative defense of license, i.e. that the use of the allegedly infringing images was licensed. (*See* Foss Decl. Exh. 1.) Further in that Answer, X did not assert the affirmative defense that the terms of service of the X Platform affected the claims or defenses in this case. (*Id.* at ¶ 4.)

On November 5, 2024, Donald J. Trump won election to a second term as President of the United States. In the November following President Trump's election, ostensibly because of his support and actions during the election, Elon Musk received an appointment as co-chair for the newly created Department of Governmental Efficiency ("DOGE"). With Elon Musk as co-chair and its de facto leader, DOGE sought to make the government smaller and more efficient by cutting government spending and downsizing the federal workforce. In so doing, DOGE sought to purge federal agencies of diversity, equity, and inclusion (DEI) and to institute large-scale firing of employees, including removal of any employee deemed DEI-adjacent. As part of this plan, DOGE has acquired access to government data and information about American citizens, public properties, scientific datasets, official websites, financial records, classified material, and federal contracts. Without getting into the controversy over the handling of DOGE's goals, for purposes of this motion Mr. Grecco found Mr. Musk's conduct at DOGE to be reprehensible.

On December 1, 2024, Michael Grecco directed his social media team to deactivate his accounts. At the time he directed his social media team to deactivate his X accounts, Michael Grecco reasonably believed that X, as the custodian of all user data for the X platform and a party to the litigation. (Grecco Decl. ¶ 9.)

Only on November 17, 2025, did X assert for the first time that posts from the @michaelgrecco account were relevant to a purported "license" defense. During the parties' meeting and conference of counsel, Counsel for X asserted that X did not know that the @michaelgrecco account—which had a blue checkmark indicating it belonged to a verified person—belonged to the Michael Grecco at issue in the DMCA takedown demands. (Foss Decl. ¶ 5.) But is that really credible? Notably, each and every DMCA takedown demand included the name and email address of Michael Grecco, rendering this argument by X's counsel entirely specious, and a cursory review of Mr. Grecco's X account would confirm it is of Grecco the

photographer, not some other person happened to be named Michale Grecco posting dog images or silly memes. (Foss Decl. Exh. 2.) In view of X's dubious assertions, Plaintiff served discovery requests on X aimed at obtaining a clear answer as to what preservation of evidence efforts X's counsel undertook, what communications and information X's counsel had regarding the @michaelgrecco handle, and whether the information is indeed truly deleted. (Foss Decl. ¶ 7.) X's responses to those discovery requests are due on December 26, 2025.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 37(e) governs sanctions related to the loss of electronically stored information (ESI). Sanctions may only be imposed if ESI that should have been preserved was lost because a party failed to take reasonable steps to preserve it, the ESI cannot be restored or replaced; and there is prejudice to another party.

Severe sanctions such as adverse inferences require a finding of intent by a party to deprive another party of the information's use in litigation. Fed. R. Civ. P. 37(e); *Porter v. City & Cty. of S.F.*, No. 16-cv-03771-CW (DMR), 2018 U.S. Dist. LEXIS 151349, at *7 (N.D. Cal. Sep. 5, 2018) (noting requirement of intent to deprive for severe sanctions); *Graham v. Honeywell Int'l Inc.*, No. 3:23-cv-04865-RFL (KAW), 2025 U.S. Dist. LEXIS 201665, at *5 (N.D. Cal. Oct. 10, 2025) ("Intent, in turn, requires more than '[n]egligent or even grossly negligent behavior.'") (citing Fed. R. Civ. P. 37 advisory committee's note (2015)). The party seeking sanctions bears the burden of proof.

## IV. ARGUMENT

X had control over the relevant data—kept on X's servers and maintained pursuant to X's policies—and failed to implement a timely litigation hold despite ample notice. Because the evidence demonstrates that any loss was neither willful nor in bad faith, and that Defendant contributed to the situation by neglecting its own preservation duties, the extreme remedy of evidentiary sanctions is simply

unwarranted. As set forth below, Defendant's failure to institute a litigation hold, MGP's lack of intent to spoliate evidence, and the absence of timely notice regarding X's purported "license" defense all weigh against the imposition of sanctions. Indeed, the Court should conclude that the responsibility for any alleged evidentiary loss lies primarily with X.

X has not met its burden to show that Michael Grecco failed to take steps to preserve evidence. As a threshold issue, the information and evidence in question was in the possession of X—not Michael Grecco or MGP. Further, Michael Grecco's motives for distancing himself from Elon Musk were political and unrelated to this litigation. Further still, Michael Grecco had no idea when he deactivated his account that X had any intention of concocting a claim of "license" and using any of the evidence or information from the @michaelgrecco handle specifically because X did not plead license as an affirmative defense—or provide any notice of such argument. Indeed, the timing of Michael Grecco's deactivation of his account is inconsistent with any genuine motive to destroy evidence, with the deactivation occurring six months after the filing of the complaint in this action and with concurrent emails to his staff expressing his dissatisfaction with Elon Musk the person's politics. Further, X's assertion that neither X nor its counsel knew that the verified Michael Grecco account on X—with the handle @michaelgrecco—belonged to Michael Grecco is disingenuous.

Above all, X's assertion that it owns a license by function of its terms of service—the argument that appears to have precipitated this motion—fails for multiple reasons. First, X has not asserted the affirmative defense (despite listing a litany of other ones) and has not factually shown that it provided any "license" to the third party users that actually posted the infringing images at issue in this case; and its Terms of Service do not state that every user of X possesses a license to all content posted by everyone else (for obvious reason—it would lack any DMCA protection at all as a business and face existential damages from every content

owner for all posts of all users as X sanctioned/licensed posts).[7] Second and related, if X is endorsing the actions of the users that made these infringing posts and asserting that those users received a license from X, X cannot assert a DMCA safe harbor defense because it has affirmatively endorsed that action. *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 41 (2d Cir. 2012) (platform's volitional conduct and knowledge undermine safe harbor defense where it took portions of user uploaded content in its own business syndication efforts; DMCA summary judgment on *that* content-use issue denied). Third, if Grecco did post the copyrighted images to Twitter or X—which he did not—the underlying users' posts were not re-posts, meaning that they did not contain any Copyright Management Information and other identifying information and that contained commentary (they did not re-tweet, that is, a Grecco post)—they posted infringing images only—so anything Grecco uploaded, even if X believes it has a license, was not in fact the content that X's infringing users used anyway. (Grecco Decl. ¶ 15.) Fourth, if X now wants to claim it can issue a retroactive license to cleanse the user's uploads, such a license would be invalid. *Davis v. Blige*, 505 F.3d 90, 103-04 (2d Cir. 2007) (retroactive license to try to bless an infringement invalid).

### A. X Failed to Institute a Litigation Hold Related to Evidence and Information in X's Possession, Custody, and Control

While MGP had access to the @michaelgrecco account online through X's website, X controlled the actual data and account information that resided on X's servers, also owned and controlled by X. Indeed, X's assertion that Michael Grecco's decision to "deactivate" his account caused X to delete the information as a matter of course fails to explain why X had not instituted a litigation hold. Defendant, as the platform operator and a sophisticated litigant, was best positioned

[7] Plaintiff's pending discovery requests seek an admission that X has not granted any license to any of the users that posted MGP's copyrighted images to the X Platform.

to preserve the @michaelgrecco account data. Upon receipt of the complaint and DMCA notices identifying the account, X was on notice that information relating to the account could be relevant to the litigation. Courts repeatedly recognize that a party's failure to implement a litigation hold constitutes a failure to take reasonable steps to preserve ESI. *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 881 F. Supp. 2d 1132, 1147 (N.D. Cal. 2012) ("The duty to preserve evidence arises when litigation is pending or reasonably foreseeable."); *UMG Recordings, Inc. v. Hummer Winblad Venture Partners (In re Napster, Inc. Copyright Litig.)*, 462 F. Supp. 2d 1060, 1066-67 (N.D. Cal. 2006) (However, a party's motive or degree of fault in destroying evidence is relevant to what sanction, if any, is imposed.")

Defendant's motion ignores its own obligation to institute a litigation hold, particularly as it controlled all relevant data and had actual notice of the account's existence and ownership. (*See, e.g.*, Foss Decl. Exh. 2 [DCMA takedown demand].) Defendant's failure to preserve the data lies at the heart of any purported loss, and sanctions are inappropriate where the moving party is itself at fault. *Cyntegra, Inc. v. Idexx Labs., Inc.*, No. CV 06-4170 PSG (CTx), 2007 U.S. Dist. LEXIS 97417, at *5-6 (C.D. Cal. Sep. 21, 2007) ("Several district courts in California have adopted the Second Circuit's three-part test to determine whether the specific sanction of an adverse inference instruction is appropriate. This test requires that a party seeking such an instruction establish that (1) the party having control over the evidence had an obligation to preserve it; (2) the records were destroyed with a culpable state of mind; and (3) the destroyed evidence was relevant to the party's claim or defense.") (citing *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 105 (2d Cir. 2002); *In re Napster*, 462 F. Supp. 2d at 1078; *Hamilton v. Signature Flight Support Corp.*, No. C 05-0490, 2005 U.S. Dist. LEXIS 40088, at *3 (N.D. Cal. Dec. 20, 2005); *AmeriPride Svcs, Inc. v. Valley Indus. Svc., Inc.*, No. CIV S-00-113, 2006 U.S. Dist. LEXIS 59398, 2006 WL 2308442, at *5 n.6 (E.D. Cal. Aug. 9, 2006)).

Notably, because X never pleaded a license defense, Michael Grecco's personal account is unrelated to both the infringement alleged and the defenses asserted.

X's brief specifically shows the option to "deactivate" the account (at 6), but then repeatedly mischaracterizes that action as "deleting" which is not an option presented to an X user. Indeed, at page 7 of its motion, X strategically used the passive voice to avoid stating who deleted the data: X states that the accounts and their data "were permanently deleted on January 1, 2025 because of Grecco's intentional actions." But the point here is that neither MGP nor Michael Grecco deleted that data—X did. A user deactivates only; X then deletes. Indeed, X's brief admits that deactivation only adds the account to a "queue" (at 8) wherein X itself would then delete the account.

(Of course, why was there no litigation hold placed by X on the account? Because even X's prior lawyers, one of the largest and most sophisticated law firms on the planet, did not see a license defense here and hence never pled it.)

Given these circumstances, the Defendant's attempt to shift responsibility for the loss of information onto MGP is unpersuasive and unsupported by the record. Twitter/X, as both the platform operator and the data custodian, was repeatedly notified of the account's ownership and relevance through formal DMCA correspondence and the Complaint itself, yet failed to take the necessary steps to safeguard the account data. Any resulting loss of account data thus stems from Defendant's disregard of its preservation duties, not from any willful or bad faith conduct by MGP. Accordingly, the motion for sanctions should be denied both because of Defendant's failure to institute a litigation hold and because Defendant remained silent regarding its belief that the @michaelgrecco account had any relevance to copyright infringement as pleaded in the complaint.

**B. MGP Did Not Intentionally Spoliate Evidence**

MGP (the entity tasked with licensing and enforcing Michael Grecco's copyrighted images) never controlled the @michaelgrecco account. Regardless,

Michael Grecco, as an individual, deactivated the @michaelgrecco account solely because of his political disagreement with the Elon Musk as the lead decisionmaker at X. Grecco's email directing the deactivation clearly identifies Mr. Grecco's dissatisfaction with Mr. Musk, and nothing in that email even remotely relates to the concealment or destruction of evidence. Further, Michael Grecco reasonably believed that X, as the custodian of all X account information and operator of the Platform, would retain all relevant account data anyway somewhere on its servers; it simply never occurred to Mr. Grecco that his account had anything to do with this action over user uploads on their accounts of infringements. (Grecco Decl. ¶ 9.) Given the political motive to deactivate the account, the Court cannot reasonably find that Michael Grecco intended to deprive X of any evidence or acted in bad faith. Defendant's suggestion that MGP's deactivation was calculated to destroy evidence lacks any factual support, particularly where X was in possession and control of the evidence on X servers and where Grecco had no idea that deactivating his account and decoupling from a Musk business would cause X to apparently permanently and  irretrievably delete everything. (We still find it hard to believe that X, SpaceX, and Tesla, and Elon Musk with all they can do technology-wise truly have deleted this account into the ether; Sarbanes-Oxley after all mandates strict retention requirement for data retention).

Michael Grecco's decision to deactivate the @michaelgrecco account as a direct response to the actions and statements of Elon Musk was based on Musk's public conduct, which Michael Grecco found objectionable to say the least. (Grecco Decl. ¶¶ 4-7.) That conduct included controversial posts, amplification of divisive rhetoric, and perceived endorsement of extremist viewpoints, all of which, in Plaintiff's view, fundamentally altered the character and values of the X platform. (*Id.*) Michael Grecco will testify to this Court about his moral and ethical discomfort with any continued participation with companies owned or run by Elon Musk. (Grecco Decl. Exh. A.) Michael Grecco acted based on his conscience as both a

protest and to distance himself from Elon Musk and Elon Musk's X platform. Michael Grecco's disgust with Elon Musk as a person should not be misconstrued as a deliberate act to destroy evidence related to X and this lawsuit.

The case law cited by X regarding the deactivation or deletion of social media accounts is distinguishable because X was the party in possession of the account information and data. Unlike the cases where Facebook accounts were deleted by a user, where the information was relevant to claims or defenses actually pleaded in the case, the X account here was in the possession of the Defendant X, and no claim or defense actually pleaded related to the content of that X account. Indeed, none of the cases cited by X involved Facebook as a litigant deleting data that Facebook possessed (and then blaming the other party). *See Facebook, Inc. v. Onlinenic Inc.*, No. 19-cv-07071-SI (SVK), 2022 U.S. Dist. LEXIS 113060, at *4-5 (N.D. Cal. Mar. 28, 2022) (Facebook brought an anti-cybersquatting case against a domain name registrar that registered and trafficked thirty-five domain names that were confusingly similar to Plaintiffs' marks). In the *Facebook v. Onlineic* case, the Defendant was actively deleting data from Defendant's own "Ticket Database" to avoid production, rendering the facts of this case entirely inconsistent with the fact pattern here. *See id.* at 11-14. In another case, involving an employee preparing a case against her former employer, the Plaintiff deleted Facebook posts and messages related to her treatment and termination by her employer prior to filing her lawsuit. *See Fast v. GoDaddy.com LLC*, 340 F.R.D. 326, 337 (D. Ariz. 2022). This case likewise does not involve the party holding the information deleting the information, where, as in the instant case, X was the party holding the information in question. Further, the motive was plain in the *Fast* case, where the contemporaneous messages between Plaintiff and her attorney indicated a clear motive to delete evidence. *See id.* at 337 (quoting a message between co-workers: "I want to post here for u as I am sure once Godaddy knows u r suing them, they will start looking for evidence online by reading your Facebook etc. since I may be your witness I do

not want them to know we talk."). To the contrary here, the contemporaneous email from Grecco—well after filing of the lawsuit—indicated a motive based on politics and Elon Musk as a person. (Grecco Decl. Exh. A.) In another case cited by X that is factually distinguishable from the present case, a Plaintiff deleted (and not just temporarily deactivated) his Facebook account the year after the Defendant had propounded discovery requests specifically seeking the "entire Facebook profile/website/webpage(s)." *See Holloway v. Cty. of Orange*, No. SACV 19-01514, 2021 U.S. Dist. LEXIS 31681, at *1-3 (C.D. Cal. Jan. 20, 2021). In our present case, the putative relevance of Mr. Grecco's X account was known only to X's second counsel in this case, with any potential license defense unpleaded in X's Answer. The key difference is notice, and X provided no notice of its intent to seek discovery into Mr. Grecco's posts on X; litigation by ambush inherently does not provide notice. Further, in the only case cited by X where a Twitter account was involved, *Hice v. Lemon*, No. 19-cv-4666, 2021 U.S. Dist. LEXIS 244521, at *1, 13-14 (E.D.N.Y. Nov. 17, 2021), Twitter was not a party to the action and thus did not delete its own data as happened here. Rather, the Hice case involved alleged assault and battery and infliction of emotional distress, where the Plaintiff "selectively" deleted social media posts, saving only posts that favored his version of the incident. *Id.* Indeed, in the Hice case, the Court cited specific text messages revealing "Hice's intent to hide unfavorable evidence." *Id.* at *15-16. No such evidence exists here, and indeed the evidence suggests that no intent to deprive existed in the present case.

### C. X Failed to Provide Notice of Its License Defense—Either in Its Answer or Otherwise—and there Is No Factual Predicate for License

License is a mandatory affirmative defense. *See supra* case law and Ninth Circuit Jury Instruction. But Defendant did not plead a license defense in its Answer, nor did it otherwise notify MGP that posts from the @michaelgrecco

account would be relevant to any such claim. (Foss Decl. Exh. 1.) The duty to preserve evidence extends only to information that is relevant or reasonably anticipated to be relevant to the litigation. *See Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991) (citing *Nation-Wide Check Corp. v. Forest Hills Distribs., Inc.*, 692 F.2d 214, 218 (1st Cir. 1982)) ("A party should only be penalized for destroying documents if it was wrong to do so, and that requires, at a minimum, some notice that the documents are potentially relevant."); *see also Vick v. Texas Employment Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975) (requiring showing of bad faith); *Reinsdorf v. Skechers U.S.A., Inc.*, 296 F.R.D. 604, 626–27 (C.D. Cal. 2013) ("The obligation to preserve evidence arises when a party has notice that the evidence is relevant to litigation or should have known that it may be relevant to future litigation."). At the time of deactivation, MGP had no reason to believe that its own posts would be at issue, as the complaint focused on unauthorized third-party use, and Defendant's Answer did not assert a license defense. Defendant's attempt to retroactively impose a preservation duty on MGP for a theory not disclosed in its pleadings is improper.

Moreover, Defendant's failure to plead a license defense or provide MGP with adequate notice regarding the relevance of account posts further undermines any argument that MGP should have foreseen the need to preserve such data. In the absence of specific disclosure or indication that user-generated content would be central to Defendant's case, MGP's actions were guided by the operative pleadings, which focused solely on unauthorized third-party infringement. This lack of clarity regarding the potential use of MGP's own posts not only negates any purported duty to preserve evidence for an unasserted claim but also highlights Defendant's attempt to shift responsibility after the fact. As such, the record does not support sanctions premised on a theory that was neither pled nor reasonably anticipated at the time of account deactivation, and the timing of these events further demonstrates the absence of bad faith or intentional spoliation by MGP.

Finally, there is no license defense. One, X never in fact licensed anything to the underlying users in fact, so what license? And, two, if X did, then it should produce those licenses. Or if X is saying that it auto licenses every X user to use other X user's posts (its Terms of Service do not say that—for good legal reason to hold onto the DMCA), then it should say so, and prepare for the avalanche of copyright litigation that follows a content entity that does not license from content owners but grants licenses to all users for anything someone else posts—an affirmative business decision that strips away any DMCA protection. *See infra*. Three, the user's did not repost/retweet anything Grecco posted, they infringed Grecco content from other sources; thus, those user posts were not even of any materials Grecco actually uploaded and so even if this mythical, theoretical license to the X users to Grecco's uploads was given, those users did not repost Grecco's uploads and there would be no relevant license anyway. This is important because if Grecco uploads a high-resolution image of a cat, for example, with his commentary and name attached to it, that is very different from someone taking the same picture from some other unauthorized source and uploading it. They are pictures of the same cat photo, but that does not make them the same. Indeed, none of the infringing posts at issue in this case were retweets, meaning that none of the images were an image or file received from Grecco. (Grecco Decl. ¶ 15) The images are different and none of the users have licenses.

**D. The Timing of Michael Grecco's Deactivation of the @michaelgrecco Account Undermines X's Assertion of Bad Faith**

The @michaelgrecco account was deactivated long after the Complaint was filed, at a time when X had actual knowledge of the account and its relevance to the litigation. Defendant's own motion acknowledges that the deactivation occurred more than five months after suit was filed and almost a year after the takedowns were first sent X. At that point, X had a clear duty to preserve the account data and

could have implemented a litigation hold or otherwise prevented deletion. Defendant's failure to do so precludes any finding of bad faith by MGP.

Furthermore, Twitter/X's repeated receipt of DMCA takedown notices and related correspondence provided ample notice of the @michaelgrecco account's ownership and relevance to this action, reinforcing its obligation to preserve pertinent data. Courts have recognized that such communications can trigger preservation duties, and Defendant's assertion of ignorance regarding the account's significance is unsupported by the record. In the absence of any demonstrated prejudice stemming from the alleged loss of account information, and given Twitter/X's opportunity and responsibility to safeguard the data, any purported harm is attributable to its own failure to act. Thus, the timing and circumstances surrounding the deactivation of the account further undermine any suggestion of bad faith by MGP and preclude the imposition of sanctions.

**E. Twitter/X's Knowledge of Account Ownership**

X has asserted that neither X nor its counsel (nor ostensibly its prior counsel) knew that the @michaelgrecco X account, which was registered to "Michael Grecco" and had a blue checkmark verification from Twitter/X indicating that the account belonged to the real Michael Grecco, actually belonged to Michael Grecco. This assertion is disingenuous and should be rejected. X was repeatedly notified of the @michaelgrecco account's ownership through DMCA takedown notices and related correspondence. (*See, e.g.*, Foss Decl. Exh. 2.) These notices provided Defendant with actual and constructive knowledge of MGP's control over the account and its potential relevance to litigation. Courts have held that notice through DMCA procedures can trigger preservation obligations. Defendant's claim that it could not identify the account or was unaware of its significance is disingenuous and unsupported by the record. (The truth is X well knew the account was irrelevant to any license defense, which is why no defense was ever pled). Given this repeated and documented notice, any assertion by Defendant that it lacked awareness of the

account's existence or its importance is further belied by the sequence of events and communications preceding deactivation. This clear record of notifications not only imposed a concrete duty on X to safeguard relevant account materials but also undermines any effort to shift responsibility onto MGP for the alleged loss.

**F. X's Newly-Minted License Defense Undermines Its DMCA Safe Harbor Argument**

The DMCA safe harbor is only available to a service provider under section 512(c)(1)(A) if the service provider "(i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;" "(ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent;" or "(iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material." 35 U.S.C. § 512(c)(1)(A). But X has now asserted that the "broad, royalty-free license" it receives by dint of its boilerplate Terms of Service[8] renders the infringing posts at issue in this case non-infringing, ostensibly based on the assertion that such license extends to those infringing posts. If X is indeed taking the position that it applied its alleged license to images posted to its website (not the actual images Grecco ever even uploaded) and sub-licensed them to other infringing users (notwithstanding the other legal consequences of such a position), X is taking the position that it is acting affirmatively as to the post made by those users, rendering X's conduct volitional (*i.e.*, authorizing, displaying, and distributing infringing content) and thereby removes X from the protections of DMCA safe harbor. *See YouTube*, 676 F.3d at 41.

If X takes the position that it actively authorizes posts by third parties containing images or other content that constitute copyright infringement, it risks

[8] The question of whether X's terms grant a license to third-party users for infringing posts is, at minimum, a disputed factual and legal issue not properly resolved on a motion for sanctions.

exposing itself to direct liability for copyright infringement outside the protections afforded by the DMCA. Courts have consistently held that volitional conduct by a platform—such as intentionally authorizing, displaying, or distributing infringing material—can defeat DMCA safe harbor defenses and establish direct liability for infringement. This is because the DMCA's safe harbor provisions are designed to protect passive service providers who merely store or transmit user content without engaging in volitional acts that facilitate infringement. *YouTube*, 676 F.3d at 32 ("Based on the text of § 512(c)(1)(A), as well as the limited case law on point, we affirm the District Court's holding that actual knowledge or awareness of facts or circumstances that indicate specific and identifiable instances of infringement will disqualify a service provider from the safe harbor.").

*YouTube* is important because the one aspect of the defense DMCA summary judgment that was not affirmed involved YouTube's business use of user uploaded content in its syndication efforts. "In or around March 2007, YouTube transcoded a select number of videos into a format compatible with mobile devices and 'syndicated' or licensed the videos to Verizon Wireless and other companies. The plaintiffs argue—with some force—that business transactions do not occur at the 'direction of a user' within the meaning of § 512(c)(1) when they involve the manual selection of copyrighted material for licensing to a third party." *YouTube*, 676 F.3d at 40. Those separate acts of taking user uploaded content and, rather than being neutral and hands off, making a business use of them walked it out of the DMCA's protections for neutral conduits. *Id.* at 39-41. It held: "the cause is REMANDED for further fact-finding regarding a fourth software function, involving the syndication of YouTube videos to third parties." *Id.* at 42.

Ninth Circuit law is similar. Content moderators acting at the direction of the platform, even if unpaid volunteers, potentially strip the social media platform of its safe harbor as they are agents of the enterprise. *See Mavrix Photographs, LLC v. LiveJournal*, *Inc.*, 873 F.3d 1045, 1056 (9th Cir. 2017).

Thus, when a platform like X is found to have taken active steps in the authorization or encouragement of infringing posts, it may be deemed to have participated directly in the infringing activity; the DMCA is out of the case and it is a straight damages case for infringement. Such conduct goes beyond the mere provision of a forum for third-party speech and can be interpreted as the platform exercising control over the dissemination of copyrighted works. And unlike YouTube's volitional syndication efforts that were auto-software driven (and still remanded), here X is apparently saying it is now going to actively license these users[9]—a truly volitional act with knowledge the users were infringing, an act that places the user uploaded content outside the DMCA. Furthermore, if X's own Terms of Service are used to justify or facilitate widespread unauthorized use of copyrighted content, this could further undermine any argument that the company is simply a neutral intermediary and has any DMCA defense to infringement at all. X cannot invoke the DMCA safe harbor as a defense against claims of copyright infringement when its own conduct goes beyond passive hosting and involves affirmative actions that facilitate or encourage the unauthorized dissemination of protected works. The statutory protections afforded by the DMCA safe harbor shield service providers who act as neutral intermediaries, not those who participate in or contribute to infringing activity.

**G. X Has Failed to Establish Prejudice Here**

Regardless of the flaws in Defendant's positions regarding spoliation, Defendant has failed to demonstrate any actual prejudice resulting from the alleged loss of ESI. The burden is on the moving party to show that the loss of evidence has meaningfully impaired its ability to defend the case. Defendant did not plead any defense related to license or the posts of Michael Grecco and only now appears to be

[9] Again, as noted above in *Davis*, retroactive licenses to bless infringements are invalid, Any retroactive attempt at license here by X claiming it is a licensee authorized to do so is invalid.

concocting some reason as to why the deactivated account (deleted by X itself) is relevant to X's own infringement.

Any suggestion of prejudice is undermined by the declaration of Michael Grecco that his policy was not to post his images to X and that none of the copyrighted images at issue in this infringement case were ever posted to the X platform by Michael Grecco. (Grecco Decl. ¶ 12.) Mr. Grecco is prepared to confirm under oath that this policy was followed. And, moreover, that he did not send to X any takedowns on user retweets of anything he may have ever posted; he sent takedowns to X/Twitter for acts of infringement of his images where the images came from the user's upload of his images acquired from some other source than anything Grecco ever uploaded. (*Id.* at ¶ 15.)

Thus, the core factual question—whether the images at issue ever appeared on the @michaelgrecco account—can be conclusively addressed by direct testimonial evidence from the account holder. Accordingly, there is no legitimate basis for severe sanctions or adverse findings against MGP. The affidavit from Michael Grecco, coupled with MGP's clear policy and the record of Defendant's own preservation failures, demonstrates that any alleged prejudice is not only unsubstantiated but instead manufactured for litigation advantage. The Court should reject efforts to exploit the account's deletion as a means to obtain factual findings that are demonstrably untrue.

## V. <u>CONCLUSION</u>

Defendant X's motion for evidentiary sanctions should be denied in its entirety. MGP did not intentionally delete anything. Michael Grecco deactivated his account well after X had an opportunity to preserve evidence and specifically because of Elon Musk's enabling of a budding fascist presidency dismantling governmental institutions. Any loss of data is the result of X's failure to institute a litigation hold and preserve relevant information after the suit was filed.

And, ultimately, this entire motion is predicated on a legal defense that has never been pled, indeed even uttered or alluded to, until his account was deactivated at which point X and its lawyers sought to create an issue to get to Court on to gain leverage or mileage against Grecco; and on a legal "defense" that is fake because no license was even granted anyway.

If the Court is to grant X leave to amend to add a license defense (it should not and Grecco will oppose that), then Grecco will concurrently seek leave to amend his Complaint to allege direct infringement claims outside the DMCA against X for all his infringements at issue here (and this will make this case much narrower as it will remove the DMCA entirely form the table), as well as Copyright Management Information claims for the failure to maintain Grecco's CMI information, name, attribution, etc. in those user posts.

Dated: December 18, 2025 **ONE LLP**

By: /s/ Taylor C. Foss
Taylor C. Foss
Peter R. Afrasiabi
Attorneys for Plaintiff,
Michael Grecco Productions, Inc.

**CERTIFICATE OF COMPLIANCE (L.R. 11-6.2)**

The undersigned, counsel of record for Plaintiff Michael Grecco Productions, Inc., hereby certifies that this brief contains 6,981 words, which complies with the word limit of L.R. 11-6.1.

Dated: December 18, 2025 By: /s/ Taylor C. Foss
Taylor C. Foss